# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

DORIS BENDY :
:
v. :
: Civil Action No. CCB-10-3385
C.B. FLEET COMPANY, INC., et al. :

...o0o...

## MEMORANDUM

Pending before this court are a motion to remand filed by the plaintiff, Doris Bendy, motions to dismiss filed by Woodholme Gastroenterology Associates, P.A. ("Woodholme"), and a motion to stay filed by C.B. Fleet Company, Inc. and C.B. Fleet Holding Company (collectively, "Fleet"). Bendy sued Fleet and Woodholme in the Circuit Court for Anne Arundel County to recover damages for injuries she sustained after ingesting a product called Phospho-soda® ("Phospho Soda"), which was manufactured by Fleet. Fleet removed the case to this court, despite the fact that complete diversity does not exist because both Bendy and Woodholme are Maryland citizens. Fleet argues that diversity jurisdiction exists because the plaintiff has no possibility of recovering against Woodholme, and thus, under the "fraudulent joinder" doctrine, Woodholme's citizenship should be disregarded for the purposes of determining this court's diversity jurisdiction. The court has reviewed the parties' papers and determined that no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2010).[1] For the reasons stated below, Fleet has not shown that Woodholme was fraudulently joined. Accordingly, the court lacks jurisdiction and will grant the plaintiff's motion to remand. Woodholme's first motion to dismiss and Fleet's motion to stay will be denied as moot. Because the court lacks jurisdiction

---

[1] Although Fleet never filed a brief in opposition to the plaintiff's motion to remand, its position on why federal jurisdiction exists is reflected in the Notice of Removal it filed when it first removed the case to this court.

1

over the action, Woodholme's second motion to dismiss will be denied without prejudice to renewal in the Maryland state court.

## BACKGROUND

The plaintiff has alleged the following facts. Bendy was scheduled to have a routine colonoscopy at Woodholme on or about June 1, 2005. (Am. Compl. ¶10.) She scheduled the colonoscopy because she had been experiencing "significant gastrointestinal distress on a regular basis" and "was hoping the colonoscopy would rule out any serious causes." (*Id*. ¶16.) Sometime prior to her appointment, she received from Woodholme "very specific [written] instructions on what [she] needed to do to prepare for her colonoscopy." (*Id.* ¶10.) Woodholme's materials instructed her "to purchase 2 packages of Fleet's Phospho Soda product and to use the product the night before her scheduled colonoscopy." (*Id.* ¶11.) They also included "specific instructions for taking the Phospho Soda product," but "did not include any warnings or precautions regarding potential health risks or adverse reactions to the Phospho Soda product." (*Id.* ¶¶11-12.)

Bendy purchased packages of Phospho Soda on or about May 31, 2005. (*Id.* ¶13.) The packages "did not contain any product inserts and there were no visible warnings on the package regarding a risk of kidney damage, failure or disease associated with the product." (*Id.* ¶14.) During the evening on May 31, 2005, Bendy ingested the Phospho Soda according to the instructions she had received from Woodholme. (*Id.* ¶15.) Shortly thereafter, the product "produced the desired results," and Bendy "experienced no pain or discomfort while cleansing her bowels." (*Id.* ¶17.) Around 1:00 a.m. that night, June 1, 2005, shortly after falling asleep, Bendy "awoke feeling very ill and disoriented." (*Id.* ¶19.) "Paramedics were called but when they examined Doris her condition seemed relatively stable and she felt much better." (*Id.*)

The next morning, she went to Woodholme for her scheduled colonoscopy. (*Id.*) Just prior to the procedure, Bendy "mentioned the incident [of the prior night, when paramedics were called to her home] to the staff at Woodholme." (*Id.* ¶20.) "[T]hey did not attach any significance to it." (*Id.*) The colonoscopy proceeded "without incident." (*Id.* ¶19.)

Sometime within a week following the colonoscopy, Bendy "began to experience persistent and significant nausea." (*Id.* ¶21.) "The nausea eventually led Doris to see her doctor and initial diagnostic tests were taken." (*Id.*) Soon thereafter, she "began to experience more severe, acute symptoms," for which she was sent to the North Arundel Hospital, now known as Baltimore Washington Medical Center (BWMC). (*Id.* ¶22.) After being evaluated there, she was "advised that her symptoms were likely the result of a 'problem' or 'condition' related to her kidneys." (*Id.*) Although the doctors treating her were aware that she had recently undergone a colonoscopy (*id.* ¶23), "[n]o doctor or healthcare provider at BWMC ever told or even suggested to Doris that her kidney failure had any connection whatsoever to her colonoscopy or her use of Phospho Soda." (*Id.* ¶25.) Rather, Bendy and her doctors "initially assumed that her kidney failure was related to and caused by her various pre-existing medical conditions including diabetes." (*Id.*) At that time, in June 2005, Bendy was diagnosed with acute renal failure. (*Id.* ¶¶24, 31.)

Following her treatment and "non-specific diagnosis" at BWMC, Bendy was referred to Dr. Bayinnah Shabazz at Mid-Atlantic Nephrology Associates, P.A., "for long term monitoring and treatment." (*Id.* ¶26.) Although Dr. Shabazz and Bendy had "a number of discussions . . . that appeared to be focused on exploring the possible cause of her kidney failure," and although "[t]he colonoscopy and the use of Phospho Soda [were] discussed," "Dr. Shabazz never suggested to Doris that Phospho Soda had any connection to her kidney failure." (*Id.* ¶27.)

3

In February 2008, approximately two years and eight months after she ingested the Phospho Soda and underwent the colonoscopy, Dr. Shabazz "advised Doris that her renal kidney failure was likely the direct result of her use of Fleet's Phospho Soda product in preparation for her colonoscopy." (*Id.* ¶28.) "Dr. Shabazz explained that she had recently attended a nephrology medical conference at which the link between Phospho Soda and renal kidney failure was discussed at length." (*Id.*) Dr. Shabazz concluded that Bendy had suffered "[a]cute renal kidney failure in June 2005 related to Fleet Phospho-Soda preparation for colonoscopy, which [caused the precipitation of] calcium phosphate crystals in her kidney." (*Id.* ¶29.) Bendy alleges that until Dr. Shabazz advised her of this possible connection in February 2008, she did not know, and had no reason to know, that Phospho Soda may have been the cause of her subsequent renal failure. She argues that the time gap between the colonoscopy and the subsequent progression of more severe symptoms "effectively masked the causal relevance of the Phospho Soda use" on May 31, 2005. (*Id.* ¶24.)

After another two-and-a-half years, on September 27, 2010, Bendy sued Fleet in the Circuit Court for Anne Arundel County to recover damages for injuries she sustained after ingesting the product. She alleged that Fleet is liable on theories of strict liability (defective design and failure to warn), negligence, breach of warranty, fraud, and fraudulent concealment. Fleet is a Virginia corporation with its principal office in Lynchburg, Virginia. (*Id.* ¶3.) She also sued Woodholme, a Maryland professional association with its principal office in Baltimore (*id.* ¶6), Maryland, alleging that it is liable for negligence based on the written materials it sent Bendy prior to her colonoscopy. (*Id.* ¶¶71-84.)[2]

---

[2] Bendy also sued Weis Markets, Inc., where she purchased the Phospho Soda. (Am. Compl. ¶¶5, 13.) By consent of the parties, summary judgment was entered for Weis Markets on December 13. (*See* ECF No. 10.)

On December 2, 2010, Fleet removed the case to this court on the basis of diversity jurisdiction, arguing that, although the plaintiff and Woodholme are both citizens of Maryland, the court should disregard Woodholme's citizenship for jurisdictional purposes under the doctrine of "fraudulent joinder." On December 28, Bendy filed a motion to remand the case to the Circuit Court for Anne Arundel County. On January 3, 2011, Woodholme filed a motion to dismiss the amended complaint pursuant to Rule 12(b)(6).

Simultaneously, Fleet has sought to consolidate this action with multidistrict litigation pending in the Northern District of Ohio. *See In re Oral Sodium Phosphate Solution-Based Products Liability Litigation*, MDL No. 2066. On December 27, 2010, Fleet filed a notice of potential tag-along action with the Judicial Panel on Multidistrict Litigation (JPML). The panel then issued a conditional transfer order, to which Bendy filed a notice of opposition. The parties have submitted briefs to the MDL panel concerning the transfer, and the panel has set the case on its March 30, 2011 docket. In light of the potential consolidation of this action with the MDL, Fleet filed a motion to stay proceedings in this court pending the MDL panel's decision on consolidation.[3]

## ANALYSIS

Ordinarily, for a federal court to exercise diversity jurisdiction, there must be "complete" diversity between the parties, which occurs "when no party shares common citizenship with any party on the other side." *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir. 1999). The complete diversity rule, "when coupled with other rules, makes it difficult for a defendant to remove a case if a nondiverse defendant has been party to the suit prior to removal." *Id.* (internal footnotes

---

[3] Despite the pendency of the conditional transfer order before the JPML, this court retains jurisdiction over the action. *See* R.P.J.P.M.L. 2.1(d) ("The pendency of a . . . conditional transfer order . . . before the Panel pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court."). Therefore, the court retains the authority to determine whether federal jurisdiction exists, and thus whether the case must be remanded to state court.

omitted). An exception to the complete diversity rule exists, however, in cases where the plaintiff has engaged in "outright fraud in the . . . pleading of jurisdictional facts" or where "there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court." *Id.* at 464. This doctrine, which carries the somewhat misleading label "fraudulent joinder,"[4] "effectively permits a district court to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." *Id.* at 461. In deciding whether a defendant has met this burden, the court is "not bound by the allegations of the pleadings, but may instead 'consider the entire record, and determine the basis of joinder by any means available.'" *Id.* at 464 (quoting *AIDS Counseling and Testing Centers v. Group W. Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990)).

Fleet does not allege that the plaintiff's claims against Woodholme were the result of "outright fraud." Accordingly, to defeat the plaintiff's motion to remand, it must show that there is "no possibility" that Bendy could recover against Woodholme. To satisfy its "heavy" burden—and thereby defeat the plaintiff's motion to remand—Fleet must show that Bendy "cannot establish a claim against [Woodholme] even after resolving *all issues of fact and law* in the plaintiff's favor." *Id.* at 464 (emphasis added). Because a court must resolve not only all issues of fact in the plaintiff's favor but also all issues of law, the fraudulent joinder standard "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Hartley v. CSX Transp. Inc.*, 187 F.3d 422, 424 (4th Cir. 1999). If the

---

[4] As the Fourth Circuit has observed:
> The term "fraudulent joinder" is a bit misleading, inasmuch as the doctrine requires neither a showing of fraud, see [*Mayes*, 198 F.3d] at 463-64 (noting that while fraud will justify application of the doctrine, there are other grounds for application), nor joinder. In fact, it is irrelevant whether the defendants were "joined" to the case or originally included as defendants; rather, the doctrine is potentially applicable to each defendant named by the plaintiff either in the original complaint or anytime prior to removal.

*Mayes*, 198 F.3d at 461 n.8.

plaintiff has even a "slight possibility of a right to relief"—a "glimmer of hope"—the defendant has failed to meet its burden and the case must be remanded to state court. *Id.* at 426.

Fleet argues there is "no possibility" Bendy could recover against Woodholme for two reasons: First, it argues that her claims are barred by the special statute of limitations that applies to cases "arising out of the rendering of or failure to render professional services by a health care provider." Md. Code Ann., Cts. & Jud. Proc § 5-109(a). Second, it argues that Bendy "has no real intention of recovering from the Woodholme Doctors" because she failed to pursue mandatory arbitration of her claims. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-2A-04. (Fleet Notice of Removal, ECF no. 1, at 4.)[5]

## I. Statute of Limitations

Under Maryland law, the statute of limitations that ordinarily applies in tort cases requires that a lawsuit be filed "within three years from the date it accrues." Md. Code Ann., Cts. & Jud. Proc § 5-101. A cause of action for negligence "accrues" when a plaintiff "knows or should have known that he has a cause of action." *Lumsden v. Design Tech Builders, Inc.*, 749 A.2d 796, 800 (2000); *see also id.* at 800-05 (discussing the evolution of the discovery rule in Maryland). "[T]he date when a particular plaintiff knows or, with due diligence, objectively should have known of the wrong, is generally a factual determination for a jury, and not the court." *Supik v. Bodie, Nagle, Dolina, Smith & Hobbs, P.A.*, 834 A.2d 170, 178 (Md. Ct. Spec. App. 2003).

---

[5] Fleet also argued in its Notice of Removal that recovery against Woodholme was impossible for a third reason: "because she makes no allegations against them or their practice." (Notice of Removal at 3.) This argument, however, was rendered moot when Bendy filed her amended complaint. Count VII alleges that Woodholme assumed a duty toward Bendy "[b]y instructing Plaintiff to purchase the Phospho Soda and by providing its own written product instructions" and breached that duty "by failing to include adequate safety warnings or similar statements in its written directions regarding Phospho Soda and by effectively replacing the manufacturer's product warnings and instructions." (Am. Compl. ¶¶ 74-75.) Count VIII alleges that Woodholme was negligent because it "endorsed the product and represented that it would be safe and effective for use as directed." (*Id.* ¶ 81.)

7

This general statute of limitations does not apply, however, in cases "arising out of the rendering of or failure to render professional services by a health care provider." Md. Code Ann., Cts. & Jud. Proc. § 5-109(a). In those cases, an action for damages must be filed "within the earlier of: (1) [f]ive years of the time the injury was committed; or (2) [t]hree years of the date the injury was discovered." *Id.* The time the "injury was committed" is when a person "sustains damages." *Edmonds v. Cytology Servs. of Md., Inc.*, 681 A.2d 546, 560 (Md. Ct. Spec. App. 1996), *aff'd sub nom. Rivera v. Edmonds*, 699 A.2d 1194 (Md. 1997). Because § 5-109(a)(1) refers to the date "the allegedly negligent act was first coupled with harm," the statute places "an *absolute* five-year period of limitation on the filing of medical malpractice claims . . . without regard to whether the injury was reasonably discoverable or not." *Rivera*, 699 A.2d at 1196 (citations omitted, emphasis in original).

Bendy ingested Phospho Soda on May 31, 2005. On June 1, 2005, she awoke feeling "ill and disoriented" (Am. Compl. ¶19) and underwent the colonoscopy that same day. A few days later, she experienced "persistent and significant nausea." (*Id.* ¶21.) That same month, she was diagnosed with acute renal failure. (*Id.* ¶¶24, 31.) In February 2008, Bendy learned from Dr. Shabazz that her renal failure "was likely the direct result of her use of Fleet's Phospho Soda." (*Id.* ¶28.) She filed the current action on September 27, 2010.

Fleet argues that Bendy has "no possibility" of recovering against Woodholme because her claims are time-barred. As noted above, under the general statute of limitations, the limitations period tolls so long as "it [is] impossible or unreasonable for a plaintiff to have sufficient notice of the nature and cause of the injury." *Supik*, 834 A.2d at 178. Here, there are factual disputes as to when Bendy learned that Phospho Soda may have caused her renal failure, and, if she did not learn of that possibility until Dr. Shabazz told her in June 2008, whether that

8

delay was reasonable. Thus, if the general statute of limitations applies rather than § 5-109, there is a definite possibility that a Maryland court would consider Bendy's complaint timely. If, however, the special statute of limitations in § 5-109 applies, her claims would be time-barred because her complaint was filed in September 2010, more than five years after June 2005, "the time the injury was committed." Md. Code Ann., Cts. & Jud. Proc § 5-109(a)(1). Therefore, to succeed in defeating Bendy's motion to remand, Fleet must show that her claims arose "out of the rendering of or failure to render professional services by a health care provider"—and that there is no possibility that a Maryland court would conclude otherwise.

Section 5-109, as stated above, applies to cases "arising out of the rendering of or failure to render professional services by a health care provider." The statute does not define the phrase. The Maryland Court of Appeals has held that, although the phrase is "somewhat ambiguous," a case falls under § 5-109 when a plaintiff alleges a "breach by the defendant, in his professional capacity, of his duty to exercise his professional expertise or skill." *Cannon v. McKen*, 459 A.2d 196, 201 (Md. 1983). A case falls outside of § 5-109, in contrast, when a plaintiff alleges an injury that is "totally unrelated to the performance of a [medical procedure]," was the result of actions that "had no conceivable medical validity," or—notably for the purposes of this case—"was not inflicted during the rendering of medical services." *Goicochea v. Langworthy*, 694 A.2d 474, 479 (Md. 1997).

Here, Bendy argues that § 5-109 does not apply because Bendy's injury "was suffered before she received any health care or treatment from Woodholme or met with any of its professionals" and because her claims "are not based on any breach of Woodholme's professional duty of care." (Pl.'s Mem. in Support of Motion to Remand ("Pl.'s Mem.") at 2.) Fleet has not cited, and the court has not found, a Maryland case under § 5-109 addressing

9

whether sending instructions to a patient about how to prepare for a medical procedure constitutes "the rendering of . . . professional services by a health care provider."[6] In other words, there is no Maryland case squarely holding that an injury like Bendy's, although allegedly inflicted prior to a patient's arrival at a doctor's office for a medical procedure, and involving instructions to take a particular substance for which no prescription was required, was "inflicted during the rendering of medical services." *Goicochea*, 694 A.2d at 479.

Although Maryland courts have repeatedly addressed the scope of § 5-109, the cases where they have held that § 5-109 applies are distinguishable. In *Goicochea*, for example, the plaintiff allegedly received injuries when his doctor applied too much pressure to his abdomen during a hernia examination. 694 A.2d at 474, 479. Similarly, in *Brown v. Rabbitt*, 476 A.2d 1167 (Md. 1984), the alleged injuries were sustained during a tubal ligation, *id*. at 1170, and in *Roberts v. Suburban Hospital Association, Inc.*, 532 A.2d 1081 (Md. Ct. Spec. App. 1987), the plaintiff allegedly acquired AIDS during a blood transfusion. *Id.* at 1088. Those cases involved injuries allegedly caused by a medical procedure itself, not by preparation for the procedure. Bendy, in contrast, alleges that her injuries were inflicted "before she received any health care or treatment from Woodholme." (Pl.'s Mem. at 2.)

It is entirely possible, indeed likely, that the Maryland courts would hold that Bendy's claims did arise from the rendering of professional services by a health care provider. In most

---

[6] The set of cases subject to § 5-109 are the same cases subject to mandatory arbitration through the Health Care Alternative Dispute Resolution Office. All claims "against a health care provider for damage due to a medical injury" must be filed with the Health Care Alternative Dispute Resolution Office. Md. Code Ann., Cts. & Jud. Proc. § 3-2A-04. The statute defines "medical injury" as any "injury arising or resulting from the rendering or failure to render health care." *Id.* § 3-2A-01(g). Thus, cases "against a health care provider" for "injury arising or resulting from the rendering or failure to render health care" are subject to mandatory arbitration under § 3-2A-04, and cases "arising out of the rendering of or failure to render professional services by a health care provider" are subject to the special statute of limitations in § 5-109. Although the language of these two statutes is not identical, Maryland courts have interpreted them as applying to the same set of cases. *See Swam v. Upper Chesapeake Med. Ctr.*, 919 A.2d 33, 38 (2007) (noting that the definition of "medical injury" in § 3-2A-04 "is also reflected in" § 5-109). Accordingly, cases interpreting either statute appear to be relevant in interpreting the other.

cases where Maryland courts have held that particular claims did *not* involve medical injuries, the injuries arose under circumstances less closely related to the exercise of medical expertise than the circumstances here. *See Swam*, 919 A.2d at 38 (claim that patient's daughter was stuck, and infected, by an uncapped hypodermic needle while she was in a hospital waiting area was not subject to § 5-109 because the injury "did not occur while a physician was rendering care"); *Afamefune v. Suburban Hospital, Inc.*, 870 A.2d 592, 603 (Md. 2005) (claim that a hospital failed to protect a 14-year-old girl from being assaulted and raped while in the hospital was not subject to § 5-109 because the alleged assault and rape "bore no relationship to the medical treatment for which [the girl] was hospitalized"); *Chew v. Meyer*, 527 A.2d 828, 830 (Md. Ct. Spec. App. 1987) (plaintiff lost his job because his doctor failed to send a note to the patient's employer that the patient was unable to work; claim did not "arise out of the doctor's failure to adhere to the level of skill or expertise ordinarily expected of a neurosurgeon," and thus was not a claim arising for medical injury); *Nichols v. Wilson*, 460 A.2d 57, 61 (Md. 1983) (holding that a claim that a doctor, who slapped a child while restraining her on an operating table for suture removal, was intentionally, maliciously, and wantonly reckless and negligent, was not a claim for medical injury because the claim "clearly sound[ed] in traditional assault and battery"); *Cannon*, 459 A.2d at 201 (claim that patient was injured when dental equipment fell on her, although a "close[]" question, was not necessarily a claim for medical injury because it did not involve a "breach by the defendant, in his professional capacity, of his duty to exercise his professional expertise or skill," and thus had to be remanded for further proceedings "to allow the plaintiffs to plead facts which show whether or not their claim falls within the Act").

But the fact that Maryland courts are likely to dismiss Bendy's claims against Woodholme is not sufficient for jurisdiction, given the Fourth Circuit's strict standard for

fraudulent joinder. Under the circumstances of this case, Fleet cannot meet its heavy burden of showing there is *no* possibility that a Maryland court would allow Bendy's claims against Woodholme to proceed. There is a "possibility"—remote, but a possibility nonetheless—that a Maryland court would find that Bendy's claim against Woodholme did not arise out of "the rendering of or failure to render professional services by a health care provider." Stated differently, "the Maryland courts have not ruled out" the possibility that the sending of instructions to a plaintiff concerning an over-the-counter, separately-manufactured product to purchase in preparation for a medical procedure would fall outside the scope of § 5-109. *See Baltimore County v. Cigna Healthcare*, 238 Fed App'x 914, 923 (4th Cir. 2007) (holding there was a possibility that Baltimore County could recover against an account manager of the defendant insurance company for negligent misrepresentation because "the Maryland courts have not ruled out, or even addressed, whether a special relationship could exist under the circumstances of this case").

## II. Failure to pursue arbitration

Fleet argues in the alternative that Bendy's claims against Woodholme are barred because she never filed a claim for non-binding arbitration. Maryland's Health Care Malpractice Claims Act requires that all claims "against a health care provider for damage due to a medical injury," defined as any "injury arising or resulting from the rendering or failure to render health care," be filed with the Health Care Alternative Dispute Resolution Office, which administers a non-binding arbitration procedure. Md. Code Ann., Cts. & Jud. Proc. §§ 3-2A-01(g), 3-2A-04. "If a claimant files an action in a circuit court without having first submitted the claim to arbitration, the court must dismiss the action." *Manzano v. Southern Maryland Hosp., Inc.*, 698 A.2d 531, 533 (Md. 1997).

As noted above, Maryland courts have interpreted the arbitration requirement in § 3-2A-04 as applying to the same set of cases as the special statute of limitation in § 5-109. *See Swam*, 919 A.2d at 38. As discussed, Fleet has not shown that Maryland courts would undoubtedly find that Bendy's claims arose from the rendering or failure to render health care. Thus there is a possibility that the Maryland courts will not dismiss Bendy's claims against Woodholme based on her failure to pursue arbitration.

## **CONCLUSION**

For the foregoing reasons, Fleet has not shown that Woodholme was fraudulently joined in Bendy's lawsuit. Accordingly, the court will grant the plaintiff's motion to remand to the Circuit Court for Anne Arundel County. Woodholme's first motion to dismiss and Fleet's motion to stay will be denied as moot. The court will deny Woodholme's second motion to dismiss without prejudice to renewing the motion in state court. A separate Order follows.

<u>March 28, 2011</u>  /s/
Date  Catherine C. Blake
United States District Judge

13